IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JANE DOE 1, JANE DOE 2,
and JANE DOE 3,

     **Plaintiffs,**

v.                    **No. 23-CV-00362**

EASTERN NEW MEXICO UNIVERSITY BOARD OF REGENTS,
MEGHAN DE LOS REYES, in her individual capacity, PAUL WEIR,
in his individual capacity, GLEN'S FITNESS LAB, and GLEN DE LOS REYES,

     **Defendants.**

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiffs JANE DOE 1, JANE DOE 2, and JANE DOE 3 are three female student-athletes at Eastern New Mexico University ("ENMU"). These student-athletes came from across the country to ENMU to play basketball and to work toward obtaining a bachelor's degree after being recruited to ENMU by Head Coach Meghan De Los Reyes. When they arrived, Coach De Los Reyes forced them to receive what she called "treatments" from her husband Glen De Los Reyes, an unlicensed and unqualified athletic "trainer." But rather than providing actual physical therapy or training to Plaintiffs', Glen De Los Reyes sexually assaulted them. ENMU—particularly ENMU Athletic Director Paul Weir—knew that other ENMU student athletes had accused Glen De Los Reyes of sexual assault in the 2021-2022 school year. Multiple athletic trainers reported the allegations of sexual assault to Weir and continually expressed their concerns about Glen De Los Reyes's work on female athletes. ENMU failed to investigate and Weir failed to report the allegations to ENMU's Title IX coordinator.  In fact, Weir took no action to protect ENMU's students, instead permitting Glen De Los Reyes to continue "treating"

student athletes like Plaintiffs. And when Plaintiffs reported their own experiences of sexual assault, ENMU and Weir, rather than protecting Plaintiffs, immediately told Coach De Los Reyes of the reports and permitted her to engage in a retaliation campaign against Plaintiffs to intimidate them from cooperating with any investigation into Glen De Los Reyes' wrongdoing.

Plaintiffs' passion is basketball. As a result of the sexual assaults they suffered at ENMU and the university's abject failure to act, they had to return to their home states to continue their coursework online, missing the important rite of passage to attend university, learn from professors, and cultivate lifelong friendships. They were forced to give up valuable athletic scholarships, jeopardizing their educations, and lost their places on the basketball team, harming their ability to continue playing collegiate sports. Plaintiffs bring this Complaint for Damages against the above-named Defendants.

## PARTIES, VENUE, AND JURISDICTION

1.      Plaintiff JANE DOE 1 is a resident of the State of Mississippi.

2.      Plaintiff JANE DOE 2 is a resident of the State of California.

3.      Plaintiff JANE DOE 3 is a resident of the State of Michigan.

4.      At all times relevant to this complaint, Plaintiffs attended Eastern New Mexico ("ENMU") as undergraduate students and were members of the Eastern New Mexico University women's basketball team.

5.      Defendant Eastern New Mexico University Board of Regents ("ENMUBOR") is a public body and instrumentality of the State of New Mexico and the empowered governing authority for ENMU, an educational institution, with its primary campus in Roosevelt County, New Mexico. *See* NMSA 1978, § 21-3-30 (1953).

6.     Defendant Meghan De Los Reyes ("Coach De Los Reyes") was until on or around April 19, 2023, employed by ENMU as the women's basketball coach. At all relevant times to this complaint, Coach De Los Reyes was a public employee within the meaning of the New Mexico Tort Claims Act ("NMTCA"), NMSA 1978, § 41-4-3(F) (2015). Coach De Los Reyes is sued in her individual capacity.

7.     Defendant Paul Weir is the Athletic Director at ENMU with supervisory authority over Coach De Los Reyes and the ENMU athletics programs. Weir is a public employee within the meaning of the NMTCA. Weir is sued in his individual capacity.

8.     Defendant Glen's Fitness Lab is a business owned and operated by Glen De Los Reyes advertising locations in Chico, California, and Portales, New Mexico, and an online coaching and/or training program. Upon information and belief, Glen's Fitness Lab is not licensed or registered in New Mexico.

9.     Defendant Glen De Los Reyes is Coach De Los Reyes' husband and a physical therapist in Roosevelt County, New Mexico. On information and belief, Glen De Los Reyes is a resident of Roosevelt County, New Mexico.

10.     The Court has original and supplemental jurisdiction over this action raising federal questions and related state law claims arising out of the same occurrence. *See* 28 U.S.C. §§ 1331, 1367(a).

11.     Venue is proper in this district under 28 U.S.C § 1391 as the incidents complained of occurred in the State of New Mexico.

3

## FACTUAL BACKGROUND

12.     ENMU is a large public university in Portales, New Mexico. ENMU's athletic

teams participate in the NCAA Division II Lone Star Conference. Like many universities,

ENMU recruits its student athletes from across the nation.

13.     ENMU receives federal financial assistance.

14.     ENMUBOR appointed Coach De Los Reyes as the head coach of its women's

basketball team in July 2021.

15.     Purportedly to ensure the players' physical fitness, Coach De Los Reyes required

players, including Plaintiffs, to be seen and treated by her husband, Glen De Los Reyes, for

"treatments."

16.     On information and belief, Glen De Los Reyes is not licensed as an Athletic

Trainer, Massage Therapist, Physical Therapist, Nutritionist, or Dietician, or any other relevant

trade or profession by the State of New Mexico.

17.     Glen De Los Reyes regularly sexually harassed ENMU student-athletes at ENMU

facilities in front of other ENMU staff. He attended practices and games on ENMU's campus.

He would visit players in the meal room after games. He would visit Coach De Los Reyes and

various female players in the ENMU women's locker room. There, he would rub players' backs

and whisper in their ears about seeing him for "treatment."

18.     Glen De Los Reyes also routinely performed physical therapy and athletic trainer-

type work on ENMU athletes at the ENMU campus athletic facilities and at the De Los Reyes

residence. He led a paid, for-profit, jiu jitsu course on ENMU's campus at ENMU's direction.

19.     ENMU's athletics department also directed him to teach self-defense courses to various ENMU teams, on campus.

20.     In permitting Glen De Los Reyes to conduct business at ENMU facilities with ENMU students, ENMU held Glen De Los Reyes out as an ENMU employee.

21.     Glen De Los Reyes acted as an agent, apparent agent, or agent in fact for ENMU or was aided in the agency ENMU afforded him.

22.     Rather than treating and helping the women's basketball players whom Coach De Los Reyes required to see her husband, Glen De Los Reyes routinely abused and sexually assaulted those players.

23.     When "treating" many women's basketball players, he did so in Coach De Los Reyes's home and upon information and belief, under the name Glen's Fitness Lab which may or may not be a licensed and insured business.

24.     As is typical with sexual predators, Glen De Los Reyes had a pattern of behavior and a common course of conduct that he exhibited towards all his victims: he targeted first-year and transfer students who lacked knowledge of the ENMU community and Portales and who also lacked support systems on campus. He insisted that certain students—only women—see him for treatment at his home rather than on ENMU's campus. He targeted those he deemed least likely to speak up and report him.

25.     Coach De Los Reyes protected her husband; she specifically instructed her players never to admit to other ENMU trainers that they had received treatments from Glen De Los Reyes, concocting a cover story that ENMU's trainers would be "jealous."

26.     At all relevant times to this complaint, Coach De Los Reyes knew or should have known that Glen De Los Reyes was assaulting female ENMU students, including her own players, and conspired with him to perpetuate his assaults and harassment on her players.

27.     Coach and Glen De Los Reyes also repeatedly instructed Plaintiffs to "never tell anyone" that they saw Glen De Los Reyes for treatments. Players, including Plaintiffs, were specifically and expressly told to "lie" if they ever were questioned about Glen De Los Reyes.

28.     However, ENMU's Athletics Department, including Defendant Weir, knew that Glen De Los Reyes was performing treatments on ENMU student athletes and that his treatments were inappropriate and abusive.

29.     ENMU's Athletics Department, including Defendant Weir, also knew or should have known that Glen De Los Reyes was not licensed in the State of New Mexico to perform the kind of treatments that he purported to provide to ENMU students, and which ENMU's Athletics Department directed him to perform.

30.     In Spring 2022, at least two basketball players reported to ENMU Athletics trainers that Glen De Los Reyes had sexually assaulted them during treatments. At least two trainers reported the abuse to Defendant Weir in February 2022.

31.     Further, Glen De Los Reyes had a reputation among athletes and trainers as a "creep" and athletes and trainers alike would warn about his "groin treatments." ENMU's administration, athletic department, and various coaches were aware of the rumors regarding Glen De Los Reyes' inappropriate touching.

32.     Defendant Weir and other ENMU athletics staff dismissed the complaints and stories, laughing them away, chilling future complaints.

6

33.     Thus, despite actual knowledge of Glen De Los Reyes' abuse, Weir took no action to protect ENMU women's basketball players, including Plaintiffs, from Glen De Los Reyes' predation.

34.     Only three players from the 2021-2022 season stayed on for the 2022-2023 season. A vast majority either stopped playing or transferred from ENMU.

35.     ENMU, specifically Coach De Los Reyes, recruited Plaintiffs JANE DOE 1, JANE DOE 3, and JANE DOE 2 in 2022 for the ENMU women's basketball team.

36.     Coach De Los Reyes targeted Plaintiffs for recruitment. Coach De Los Reyes told JANE DOE 3, that she would have a new family in her ENMU team, and that Coach De Los Reyes took a "family oriented" approach to coaching.

37.     Plaintiffs arrived in Portales for training and orientation in August 2022.

38.     Although Plaintiffs enrolled at ENMU on athletics scholarships to play women's basketball, each planned to use the education and degree she obtained to further career opportunities outside basketball.

39.     In order to remain on their athletics scholarships, Plaintiffs were required to maintain their positions and standing on the ENMU women's basketball team.

40.     Coach De Los Reyes, in her official capacity as ENMU women's basketball coach, was responsible for setting players' playing time for basketball games. Criteria included basketball skill, physical fitness, and, as any athlete knows, rapport with the coach.

41.     Thus, to remain on their athletic scholarships, JANE DOE 1, JANE DOE 2, and JANE DOE 3 had to stay in Coach De Los Reyes' good graces.

42.     Plaintiffs understood that refusing to receive the "treatments" from Glen De Los Reyes would lead to reduced playing time.

43.     Coach De Los Reyes expressly required Plaintiffs and certain teammates to see Glen De Los Reyes for "treatments."

44.     Thus, despite actual knowledge of the allegations against Glen De Los Reyes from the 2021-2022 school year, Coach De Los Reyes *still required her players to see him* for the 2022-2023 school year.

45.     On August 20, 2022, Coach De Los Reyes hosted a mandatory team dinner at her and Glen De Los Reyes' home.

46.     There, Coach De Los Reyes told the entire team that they should see Glen De Los Reyes for "treatments" whenever possible if they wished to demonstrate their commitment to physical fitness and the team. At the team dinner, Coach De Los Reyes instructed players to go into a back room in their home to "be treated" by Glen De Los Reyes, one by one, even if they were uninjured.

47.     The treatment that JANE DOE 1 received that night was overly painful and strange but was otherwise free of sexual assault.

48.     However, Glen De Los Reyes sexually assaulted JANE DOE 3 that evening. He rubbed her vagina and breasts, and then painfully jabbed at her vagina with his thumb, all while grunting and moaning. He did not ask for or receive JANE DOE 3's consent for these actions. Indeed, when JANE DOE 3 told him to stop, he continued rubbing her groin, saying he needed to "finish the treatment."

49.     Afterwards, Glen De Los Reyes started a group text message thread with several players, having received their phone numbers from Coach De Los Reyes. Over the course of the season, Glen De Los Reyes would send players text messages, sometimes late at night, telling them to see him for "treatments."

50.     JANE DOE 3 reported her experience to ENMU athletics trainers. Not surprisingly given ENMU's indifference to previous reporting of Glen De Los Reyes' abuse, ENMU took no action in response to JANE DOE 3's reporting.

51.     Instead, JANE DOE 3 would suffer for the rest of the season from Coach De Los Reyes' harassment and retaliation for JANE DOE 3's refusal to again submit to Glen De Los Reyes for additional treatment.

52.     As the semester progressed, Coach De Los Reyes increased her insistence that Plaintiffs see her husband for treatment. For example, in late August or early September she told Plaintiffs that "obviously [they] don't care about [their] bodies" because they had not seen her husband for treatment recently, and she threatened Plaintiffs with lost playing time in the upcoming season.

53.     Coach De Los Reyes and Glen De Los Reyes continued instructing  JANE DOE 1, JANE DOE 2, JANE DOE 3, and other players never to tell anyone about Glen's treatments and if asked, instructed them to lie.

54.     Coach De Los Reyes' threats were not idle or meaningless; as student athletes, Plaintiffs' careers depended entirely on their performance on the basketball court, and lack of playing time would doom their future careers. They would be unable to pursue careers as professional basketball players if they were benched. Their athletic scholarships depended on

their performance on the basketball court. By threatening Plaintiffs with lost playing time, Coach

De Los Reyes jeopardized Plaintiffs' educational and career opportunities.

55.     Indeed, JANE DOE 3 immediately refused to ever see Glen De Los Reyes again

after he assaulted her at the team dinner. And immediately, Coach De Los Reyes retaliated

against JANE DOE 3, docking her playing time and treating her as an outcast from the team.

56.     Pressured—by their coach's direct threat and the example she made of JANE

DOE 3, and by Coach De Los Reyes' husband's texts telling them to visit—JANE DOE 1 and

JANE DOE 2 went to Glen De Los Reyes for treatment in late September 2022.

57.     Megan De Los Reyes told JANE DOE 1 to visit Glen De Los Reyes for a leg

injury in late September. Rather than treating JANE DOE 1's leg, he sexually assaulted her,

painfully groping her vagina and breasts while grunting and moaning. He did not ask for, and

certainly did not receive, JANE DOE 1's consent for these actions.

58.     In or around October 2022, ENMU athletics officials, including Defendant Weir,

Dr. Joel Sievers, and at least three ENMU trainers, met with Glen De Los Reyes and Coach De

Los Reyes regarding new allegations of sexual assault and Glen De Los Reyes' alleged

"treatments."

59.     Despite reports of sexual assault allegations to Paul Weir during the spring of

2022, this was the first time any ENMU official took any action in response. At the meeting, Dr.

Joel Sievers confronted Glen De Los Reyes about the allegations of sexual assault.

60.     Glen De Los Reyes denied any wrongdoing at this meeting yet admitted that he

had secretly filmed his sessions with all students.

61.     Defendant Weir did not inquire into this startling and illegal admission. Instead, Weir merely asked Glen De Los Reyes to stop offering unsupervised treatments to ENMU students at his home. Offering a "compromise," Weir invited Glen De Los Reyes to treat students at ENMU athletics facilities.

62.     Such an invitation, along with the contract that ENMU makes students sign agreeing not to see any non-ENMU trainer for treatment without prior approval, shows Glen De Los Reyes' status as an agent, apparent agent, or agent in fact of ENMU.

63.     Glen De Los Reyes rebuffed Weir's request, stating that he would continue treating ENMU students at his home, unsupervised.

64.     Weir took no action in response to Glen De Los Reyes' vow to continue treating ENMU students unsupervised at his home.

65.     In taking no action to prevent Glen De Los Reyes—whom Weir knew was accused of sexually assaulting students—from continuing to treat students at the De Los Reyes residence unsupervised, Weir ratified the De Los Reyes' practice of requiring female students to receive treatments from Glen De Los Reyes at the De Los Reyes residence.

66.     Coach De Los Reyes told JANE DOE 2 to see her husband for a mild ankle injury in early October of 2022. Instead of treating JANE DOE 2's ankle, Glen De Los Reyes groped her groin, including her vagina. JANE DOE 2 asked him to stop on multiple occasions, but he refused, saying he "need[ed] to finish the treatment." Glen De Los Reyes then laid down on top of JANE DOE 2, pinning her, his chest to her back and jamming his penis between her buttocks while fondling her breasts, before releasing her.

67.     After these assaults, JANE DOE 1 and JANE DOE 2 never wanted to see Glen De Los Reyes again. They expressed their reluctance to their coach, Coach De Los Reyes, who overrode their concerns and directed them to again see her husband. Coach De Los Reyes again told JANE DOE 1 and JANE DOE 2 that, to play on her team, they needed to demonstrate a commitment to fitness, and to demonstrate such a commitment, they needed to continue seeing her husband for "treatments."

68.     JANE DOE 1 and JANE DOE 2 both saw Glen De Los Reyes twice more in October 2022, with similar assaults and abuse occurring each time.

69.     After being assaulted again in October, despite the risk to their playing time, JANE DOE 1 and JANE DOE 2 thereafter refused to again see Glen De Los Reyes in private and refused to visit the De Los Reyes residence.

70.     In late October 2022, Coach De Los Reyes confiscated JANE DOE 2's car keys, purportedly as punishment for getting a traffic ticket.

71.     After JANE DOE 2's parents demanded her keys be returned, Coach De Los Reyes told JANE DOE 2 she had to come to the De Los Reyes residence to pick them up. A teammate drove JANE DOE 2 to the De Los Reyes residence and dropped her off there. When she arrived, Coach De Los Reyes told JANE DOE 2 that she needed to see Glen De Los Reyes for a treatment before she could get her keys to leave. Coerced—stuck at the De Los Reyes residence with no way of leaving—JANE DOE 2 was forced to submit to a treatment.

72.     In that treatment, Glen De Los Reyes again sexually assaulted JANE DOE 2. He lay down on top of her, pinning her down, and rubbed his penis on her buttocks while groaning

and grunting. He also groped her genitals and breasts. When JANE DOE 2 told him to stop, he continued pinning her down, saying he needed to "finish the treatment."

73.     Afterwards, Coach De Los Reyes told JANE DOE 2 that she had the car keys in her office on campus and they would have to drive to get the keys. Thus, Coach De Los Reyes concocted a ruse about JANE DOE 2's car keys to trick JANE DOE 2 into seeing Glen De Los Reyes for a treatment, at which he sexually assaulted JANE DOE 2. After manipulating JANE DOE 2 into getting sexually assaulted by her husband, Coach De Los Reyes drove JANE DOE 2, in an ENMU-owned vehicle, back to the ENMU campus.

74.     On information and belief, Glen De Los Reyes secretly recorded his "treatment" sessions that he did at the De Los Reyes residence. He never informed Plaintiffs that they were being recorded. Such recordings would have captured his abuse.

75.     Plaintiffs knew immediately that Glen De Los Reyes had abused them. They began suffering from serious depression and anxiety as a result, but they were afraid to report him for myriad reasons. First, they knew that ENMU administrators had been aware of Glen De Los Reyes' abuse for over a year but did nothing to prevent it. Second, they feared retaliation from Coach De Los Reyes, who would dock their playing minutes or even kick them off the team, jeopardizing their athletic scholarships, education, and careers.

76.     In late October 2022, an ENMU athletics trainer (ATHLETIC TRAINER 1), treated JANE DOE 1 a few days after she was assaulted by Glen De Los Reyes at the De Los Reyes residence.

77.     ATHLETIC TRAINER 1 reported that she could often tell when students had seen Glen De Los Reyes based on extensive bruising around their upper thighs.

78.     On seeing bruising all along JANE DOE 1's legs, ATHLETIC TRAINER 1 asked

JANE DOE 1, unprompted, whether she had been seeing Glenn De Los Reyes. Worried about

retaliation from Coach De Los Reyes, and specifically recalling her instructions to "lie," JANE

DOE 1 denied that she had seen Glen De Los Reyes merely by shaking her head.

79.     Unconvinced by JANE DOE 1's halfhearted denial, ATHLETIC TRAINER 1

reported the bruising, and her suspicion that Glen De Los Reyes was responsible for it, to

Defendant Weir.

80.     A similar interaction occurred later that week between another ENMU athletic

trainer (ATHLETIC TRAINER 2) and JANE DOE 2. ATHLETIC TRAINER 2 recognized

bruising along JANE DOE 2's upper thighs and groin, and asked whether JANE DOE 2 had seen

Glen De Los Reyes. Recalling the instructions to "lie," JANE DOE 2 shook her head.

81.     On information on belief, ATHLETIC TRAINER 2 also immediately reported to

Defendant Weir her belief that Glen De Los Reyes had abused JANE DOE 2.

82.     Weir and other ENMU athletics administrators had long known that Glen De Los

Reyes was abusing and assaulting ENMU athletes. But on hearing this latest allegation, rather

than conducting any investigation or inquiry, Defendant Weir did nothing. Meanwhile, Plaintiffs

continued suffering Coach De Los Reyes' abuse for their refusal to see her husband, continued

suffering anxiety and depression as a result of the assaults, continued having their playing time

reduced, and continued to spiral academically.

83.     Despite Defendant Weir's failure to take any protective action, ENMU's trainers

knew that Plaintiffs had been assaulted and were suffering. Frustrated by Weir's inaction—they

knew that Weir had specific knowledge of Glen De Los Reyes' abuse since early Spring 2022 —

two ENMU trainers finally reported the abuse to ENMU's human resources ("HR") department in early January 2023.

84.     Nonetheless, it would still take another month before ENMU took any substantive measures in response to the allegations.

85.     On or around January 28, 2023, another ENMU athletic trainer (ATHLETIC TRAINER 3), told JANE DOE 1 to stay in the weight room after training one day. He told JANE DOE 1 that he was taking her to file a complaint with ENMU's HR department.

86.     There, JANE DOE 1 was interviewed by Stephanie Miles and Benito Gonzales, ENMU's HR Director.

87.     JANE DOE 1 gave a full account of her abuse at Glen De Los Reyes' hands, as well as Coach De Los Reyes' complicity in the abuse and the retaliation she had suffered for her refusal to see Glen De Los Reyes again after the third instance.

88.     The very next day, Coach De Los Reyes called JANE DOE 1 into her office to ask about her reporting, meaning that, somehow, JANE DOE 1's reporting of the abuse was immediately divulged to Coach De Los Reyes.

89.     In the meeting, Coach De Los Reyes berated JANE DOE 1 and told her she thought JANE DOE 1 was lying. Coach De Los Reyes insinuated that since JANE DOE 1 didn't like the treatment, she must be gay. She warned JANE DOE 1 that she would "ruin people's lives" if she did not recant. But she admitted that her husband's treatments were "weird" and that he touches "certain places" in his treatments.

90.     On or around January 30, Gonzales and Miles interviewed JANE DOE 2, who also provided some information about Glen and Coach De Los Reyes' abuse.

91.     After reporting, JANE DOE 2 was immediately called into Coach De Los Reyes' office for a lecture similar to the one JANE DOE 1 received. Coach De Los Reyes called JANE DOE 2 "immature" and urged her to disavow her reporting. Coach De Los Reyes then contacted JANE DOE 2's mother to "report" to her mother that JANE DOE 2 was "spreading false rumors."

92.     In the ensuing weeks, rather than taking the allegations seriously, Coach De Los Reyes continued retaliating against Plaintiffs and sought to intimidate them from further reporting.

93.      She punitively made Plaintiffs run extra laps at practice. She reduced their playing time. She treated them as outcasts from the team. She ignored Plaintiffs when they would speak to her. She criticized, insulted, and humiliated Plaintiffs, saying things like they "obviously do not like men," insinuating about Plaintiffs' sexual orientation, often in front of the entire team.

94.     For months, Plaintiffs suffered under Coach De Los Reyes' retaliation and ENMU's deliberate indifference to the assaults they had experienced.

95.     Plaintiffs suffered from resulting depression, anxiety, and lower performance in their academic and athletic careers.

96.     Rather than a productive and educational first year ENMU, Plaintiffs were sexually assaulted by Glen De Los Reyes, benched and harassed by Coach De Los Reyes, and ignored by Weir and ENMU.

97.     Thus, as a result of Glen De Los Reyes' abuse, Coach De Los Reyes' retaliation, and ENMU's deliberate indifference, Plaintiffs were deprived of an equal educational opportunity.

98.     Despite actual knowledge of Glen De Los Reyes' abuse since early Spring 2022, it was not until February 2023 that ENMU conducted any sort of investigation into Glen De Los Reyes. And ENMU, even while purporting to conduct an "investigation," took minimal action to protect Plaintiffs from Glen or Coach De Los Reyes.

99.     Glen De Los Reyes continued visiting the team at games, practices, and the locker room well into the Spring 2023 semester, only getting banned from ENMU's campus in February. After being banned from campus, he continued texting Plaintiffs and offering "treatments" to ENMU student athletes at the De Los Reyes residence.

100.    Despite ENMU's actual knowledge that Coach De Los Reyes was retaliating against Plaintiffs, no action was taken to protect Plaintiffs or to mitigate the retaliation. Indeed, Coach De Los Reyes was somehow informed when Plaintiffs met with ENMU's HR representatives.

101.    Instead of supporting the victims of Coach and Glen De Los Reyes' abuse, ENMU employees took steps to silence and intimidate Plaintiffs.

102.    On or around February 13, Defendant Weir called Plaintiffs into his office under the pretense of inquiring into their wellbeing. But he told them "what happened happened," and that Weir did "not want to make things awkward" for Coach or Glen De Los Reyes. He told Plaintiffs that he was "sorry" they had been assaulted but insisted that "at least we aren't like

[New Mexico State University]," whose basketball team had recently been involved in a shooting at the University of New Mexico campus in Albuquerque, New Mexico.

103.    In addition to these callous remarks, Weir also threatened Plaintiffs and sought to intimidate them from continuing to report Glen De Los Reyes' abuse and Coach De Los Reyes' retaliation. Weir told Plaintiffs that they should not sue Glen De Los Reyes or ENMU and should stop cooperating with ENMU's HR department or else they might lose their athletic scholarships, be removed from the basketball team, and be forced to leave ENMU.

104.    Plaintiffs refused to accede to Weir's threats and intimidation. Instead, they continued cooperating with the investigation being conducted by Gonzales and Reynolds.

105.    At one away game in Texas, Plaintiffs and multiple witnesses saw Weir tell Coach De Los Reyes that she needed to "figure this out" and "squash the rumors," referring to the allegations against her husband.

106.    Coach De Los Reyes responded by redoubling her retaliation against Plaintiffs, docking their playing time further, making them run extra laps and other physical exercise as punishment, and ignoring them when they spoke to her.

107.    At no time did any ENMU employee, including Defendant Weir, report the abuse to ENMU's Title IX Coordinator.

108.    As a result of Defendants' actions, Plaintiffs have been forced to leave ENMU's campus, finish the Spring 2023 semester remotely, and transfer to new schools. Their academic, athletic, and professional careers have been irreparably harmed.

**COUNT I:**
**NEGLIGENCE AGAINST ENMUBOR, MEGHAN DE LOS REYES, GLEN DE LOS REYES, GLEN'S FITNESS LAB, AND PAUL WEIR**

109.     Plaintiffs incorporate by reference all preceding paragraphs as if stated fully herein.

110.     Prior to the sexual assaults perpetrated against Plaintiffs, Defendant ENMUBOR, by and through its agents, servants, and employees, knew or reasonably should have known of Defendant Glen De Los Reyes' sexually abusive and exploitative propensities. It was foreseeable that if Defendant ENMUBOR did not adequately exercise or provide the duty of care owed to ENMU student athletes using its facilities and on its campus, including but not limited to Plaintiffs, that those students would be vulnerable to sexual assault by Glen De Los Reyes.

111.     Defendant ENMUBOR had a duty to protect students using its facilities and on its campus, including Plaintiffs. Defendant ENMUBOR had a duty to use reasonable care to protect students from known or foreseeable dangers. Defendant ENMUBOR owed Plaintiffs, as student invitees, a special duty of care, in addition to a duty of ordinary care.

112.     Defendant ENMUBOR breached its duties of care to Plaintiffs by allowing Defendant Glen De Los Reyes to come into contact with them without appropriate supervision; by failing to properly investigate Glen De Los Reyes' conduct and practices; by failing to inform or concealing from Plaintiffs' parents, guardians, and law enforcement officials that Glen De Los Reyes was sexually abusing students; and by holding out Glen De Los Reyes to the University and student community at large as being in good standing and trustworthy as a person of stature and integrity.

113.    By ignoring Glen De Los Reyes' propensity for sexual assault and abuse, and abusive conduct, Defendant ENMUBOR negligently maintained a dangerous condition in its buildings and facilities.

114.    As a direct and proximate result of Defendant ENMUBOR's multiple and continuous breaches, Plaintiffs have suffered economic injury and general, special, and consequential damages in an amount to be proven at trial.

115.    As a result of the above-described conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, severe anxiety, depression, feelings of self-blame, hypervigilance, a lost sense of trust, a sense of being tainted, and relationship and intimacy issues, and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life.

## COUNT II:
## SEXUAL BATTERY AGAINST GLEN DE LOS REYES

116.    Plaintiffs incorporate by reference all preceding paragraphs as if stated fully herein.

117.    Glen did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiffs' person, which would offend a reasonable sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiffs' person that would offend a reasonable sense of personal dignity.

118.    On information and belief, ENMU ratified and authorized Defendant Glen De Los Reyes' sexual battery and assault of Plaintiffs by: (i) allowing him to come into contact with Plaintiffs without supervision; (ii) failing to inform or concealing from Plaintiffs, Plaintiffs'

parents, and law enforcement officials that Glen De Los Reys was sexually abusing students; (iii) by holding out Glen De Lose Reyes to the University and student community at large as being in good standing and trustworthy; (iv) failing to take steps to timely remove Coach De Los Reyes from ENMU's athletic program and terminate its affiliation with Glen De Los Reyes so as to prevent them from using the authority bestowed upon them by ENMU to gain access to students, like Plaintiffs, and sexually harass and assault them; and (v) by failing to bar Glen De Los Reyes' presence at ENMU-owned facilities, such as the ENMU athletics center and locker rooms, and failing to prohibit Glen from requiring students to meet him at the De Los Reyes residence.

119.    Because of Glen De Los Reyes' age and position of authority, physical seclusion of the Plaintiff, Plaintiffs' mental and emotional state, and Plaintiffs' reasonable reliance on Defendants' representation that Glen De Los Reyes was providing legitimate athletic training and treatment, the Plaintiffs were unable to, and did not and could not, give consent to such acts.

120.    As a direct and proximate result of Glen De Los Reyes' actions, Plaintiffs sustained serious and permanent injuries to their persons, in an amount to be shown at trial.

121.    Glen De Los Reyes' conduct was reckless, malicious, wanton, and willful and justifies the imposition of punitive damages.

## COUNT III:
## VIOLATION OF THE NEW MEXICO HUMAN RIGHTS ACT BY ENMUBOR

122.    Plaintiffs incorporate by reference all preceding paragraphs as if stated fully herein.

123.    Plaintiffs state a claim for violation of the New Mexico Human Rights Act, NMSA 1978, Section 28-1-7 (2020).

124.     The New Mexico Human Rights Act protects persons in public accommodations from discrimination on the basis of sex, sexual orientation and gender identity.

125.     The New Mexico Human Rights Act prohibits as an unlawful discriminatory practice "any person in any public accommodation to make a distinction, directly or indirectly, in offering or refusing to offer its services, facilities, accommodations or goods to any person because of . . . sex [or] gender identity[.]" *Id.*

126.     A public accommodations provider's deliberate indifference to a known risk of gender-based violence is unlawful under the New Mexico Human Rights Act.

127.     In offering Plaintiffs educational services, ENMUBOR discriminated against them based on their sex and gender by refusing to protect them against a known risk of sexual violence.

128.     When Coach De Los Reyes learned Plaintiffs had reported sexual assault against her husband, she created a hostile environment.

129.     ENMUBOR is liable for sexual assault against its students that it anticipated or should have anticipated, as well as for the hostile environment imposed upon them by its employees.

130.     Plaintiffs have exhausted their administrative remedies under the New Mexico Human Rights Act.

131.     As a result of ENMUBOR's violations of the New Mexico Human Rights Act, Plaintiffs have suffered personal injury, mental and emotional distress, and damages.

**COUNT IV:**
**RETALIATION IN VIOLATION OF THE NEW MEXICO**
**WHISTLEBLOWER PROTECTION ACT**

132.    Plaintiffs incorporate by reference all preceding paragraphs as if stated fully

herein.

133.    The New Mexico Whistleblower Protection Act ("WPA") forbids public

employers from, among other things, "tak[ing] any retaliatory action against a public employee

because the public employee . . . communicates to the public employer or a third party

information about an action or a failure to act that the public employee believes in good faith

constitutes an unlawful or improper act[.]" NMSA 1978, § 10-16C-3(A) (2010).

134.    As student athletes playing for ENMU's women's basketball team and receiving

remuneration from ENMU, Plaintiffs qualify as public employees under the WPA.

135.    A protected disclosure under the WPA is any good faith communication that

discloses or demonstrates an intention to disclose information that may show an "unlawful or

improper act," such as any "practice, procedure, action or failure to act" that violates any law or

"constitutes malfeasance in public office." NMSA 1978, § 10-16C-2(E) (2010).

136.    During their tenure at ENMU, Plaintiffs made several protected disclosures to

ENMU's athletics department, including to Coach De Los Reyes and Weir, including but not

limited to:

  a.    Reporting Plaintiffs' experiences of sexual assault by Glen De Los Reyes;

  b.    Reporting Coach De Los Reyes' retaliation against Plaintiffs for reporting

  her husband's sexual assaults; and

c.      Reporting Defendant Weir's failure to take any action to prevent the

sexual assaults or even report them to ENMU's Title IX coordinator, as required by

federal law.

137.    These communications constitute protected disclosures under Section 10-16(C)-2.

138.    ENMU, by and through Coach De Los Reyes, retaliated directly against Plaintiffs

for whistleblowing by docking their playing minutes, making humiliating and insulting remarks

about Plaintiffs' sexual orientation, making them run extra laps, and other punitive measures.

139.    Defendant Weir further retaliated against Plaintiffs by discouraging them from

further reporting and discouraging them from bringing a lawsuit to vindicate their rights under

state and federal law.

140.    As a result of Defendants' retaliation, Plaintiffs suffered damages, including lost

scholarships, lost wages, and emotional damages.

## COUNT V:
## VIOLATION OF THE NEW MEXICO CIVIL RIGHTS ACT
## AGAINST ENMUBOR

141.    Plaintiffs incorporate by reference all preceding paragraphs as if stated fully

herein.

142.    Article II, Section 18 of the New Mexico Constitution provides, in relevant part,

that "[n]o person shall be deprived of life, liberty or property without due process of law[.]" This

provision generally mirrors, but also provides greater protection than, the Fourteenth

Amendment to the United States Constitution, both in text and in application by New Mexico

courts. *Cf. State v. Gomez*, 1997-NMSC-006, ¶ 20, 122 N.M. 777, 932 P.2d 1.

143.     Like the Fourteenth Amendment, Article II, Section 18 of the New Mexico

Constitution creates a substantive due process right. *See Morris v. Brandenburg*, 2016-NMSC-

027, ¶ 19, 376 P.3d 836, 844. Substantive due process claims under Article II, Section 18

"inquire whether a statute or government action shocks the conscience or interferes with rights

implicit in the concept of ordered liberty." *Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037,

¶ 50, 306 P.3d 457.

144.     Coach De Los Reyes created an unconscionably dangerous condition by coercing

Plaintiffs to receive treatment from Glen De Los Reyes despite the fact that she knew or should

have known that Glen De Los Reyes was sexually assaulting Plaintiffs. Defendants ENMUBOR

and Weir compounded this dangerous condition by refusing to take any action to protect

Plaintiffs, despite actual knowledge that they were in danger of sexual assault. Defendants

ENMUBOR and Weir further failed to monitor and supervise Coach De Los Reyes and Glen De

Los Reyes, creating a direct and foreseeable risk of students being sexually assaulted. And

ENMUBOR and Weir had a special relationship with Plaintiffs requiring their protection against

the risk they created.

145.     As young women, Plaintiffs are particularly vulnerable to the risk presented by a

physical trainer with known proclivities to sexually abuse student athletes like Plaintiffs.

146.     Defendant Weir's deliberate refusal to take any protective action placed Plaintiffs

at a substantial risk of serious, immediate, and proximate harm, and this risk was obvious and

known by ENMUBOR and Weir

147.     Defendants' conduct is outrageous, shocks the conscience, and violates Plaintiffs'

substantive due process and equal protection rights under Article II, Section 18, of the New

Mexico Constitution. *See Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir. 1994) (noting that it is

clearly established that "a person who exercises the state's supervisory authority may be held

liable for consciously acquiescing in sexually harassing conduct by a non-state actor over whom

the state actor has authority"); *Woodward v. City of Worland*, 977 F.2d 1392, 1397 (10th Cir.

1992) ("[S]exual harassment . . . can violate the Fourteenth Amendment right to equal protection

of the laws.").

148.     Article II, Section 18 of the New Mexico Constitution is included within the New

Mexico Bill of Rights. Claims for violations of the New Mexico Bill of Rights are brought

pursuant to the New Mexico Civil Rights, NMSA 1978 § 41-4A-3 (2021).

149.     By the conduct described above, ENMUBOR violated the New Mexico Civil

Rights Act.

150.     As a result of Defendants' outrageous and conscience-shocking behavior,

Plaintiffs have suffered significant injuries and damages, including mental anguish and distress,

emotional anguish and distress, physical pain and suffering, and other damages.

**COUNT VI:**
**INVASION OF PRIVACY AGAINST**
**GLEN DE LOS REYES AND MEGHAN DE LOS REYES**

151.     Plaintiffs incorporate by reference all preceding paragraphs as if stated fully

herein.

152.     NMSA 1978, Section 30-12-11(A) (1973), gives "[a]ny person whose wire or oral

communication is intercepted, disclosed or used" a cause of action "against any person who

intercepts, discloses or uses, or procures any other person to intercept, disclose or use such

communications."

153.    The statute sets damages at $100 "for each day of violation or [$1,000], whichever is higher; punitive damages; and a reasonable attorney fees and other litigation costs reasonably incurred." *Id.* § 30-12-11(A)(2).

154.    Glen De Los Reyes and Coach De Los Reyes placed cameras in their home.

155.    Glen De Los Reyes secretly filmed Plaintiffs' treatments in his home.

156.    Glen and Coach De Los Reyes did not inform Plaintiffs or any other ENMU women's basketball player about the cameras.

157.    The camera was present for several months and captured one session with JANE DOE 3, two sessions with JANE DOE 2, and three sessions with JANE DOE 1.

158.    Glen De Los Reyes secretly recorded Plaintiffs' oral communications.

159.    Glen De Los Reyes violated Plaintiffs' statutorily guaranteed right of privacy over at least two months.

160.    As a result, Plaintiffs are entitled to $100 for each day of violation or $1,000, whichever is higher, plus attorney fees and other litigation costs.

## COUNT VII:
## DISCRIMINATION IN VIOLATION OF TITLE IX,
## 20 U.S.C. § 1681, AGAINST ENMUBOR

161.    Plaintiffs incorporate by reference all preceding paragraphs as if stated fully herein.

162.    Plaintiffs were sexually assaulted by Defendant Glen De Los Reyes, husband of Coach De Los Reyes, and an agent, apparent agent, or agent in fact of ENMUBOR.

163.    Plaintiffs were sexually assaulted at the De Los Reyes residence.

164.    In holding mandatory team dinners at the De Los Reyes residence, and in expressly permitting Glen De Los Reyes to provide treatments to ENMU students there, ENMUBOR exercised substantial control over both Glen De Los Reyes, the De Los Reyes residence, and Glen De Los Reyes' treatment of students there.

165.    The risk of assault by Glen De Los Reyes was obvious and apparent to Defendants, given Glen De Los Reyes' history of sexually assaulting student athletes like Plaintiffs.

166.    Defendant Weir was an ENMUBOR official with knowledge of the sexual assaults and the risk of sexual assaults, and had authority to intervene.

167.    ENMUBOR had a duty to address this risk because sexual assault is a form of sex discrimination prohibited by Title IX.

168.    ENMUBOR was deliberately indifferent to a substantial risk of sexual abuse but failed to investigate that conduct and take corrective action as required by Title IX.

169.    ENMUBOR was deliberately indifferent to a substantial risk of sexual abuse to its students in that ENMUBOR had actual knowledge of Glen De Los Reyes' misconduct and responded unreasonably in failing to terminate Coach De Los Reyes' employment, publicize her husband's misconduct, and remove him from situations in which he could and would continue to abuse students, including Plaintiffs, at federally funded ENMU facilities.

170.    ENMUBOR further permitted retaliation against Plaintiffs, on ENMU's campus, for reporting Glen and Coach De Los Reyes' abuse.

171.    Retaliatory acts such as preventing students from participating in school activities and threatening expulsion against any individual who exercises her rights under Title IX, are considered discriminatory and are unlawful.

172.    Because of Plaintiffs' sexual assault and subsequent retaliation, they were forced to give up their scholarships, withdraw, and transfer from ENMU.

173.    Plaintiffs' sexual assault and retaliation were so severe as to deny them an equal educational opportunity.

174.    As a direct and proximate result of ENMBUR's violation of Plaintiffs' rights under Title IX, Plaintiffs have suffered and continue to suffer losses of education opportunities and benefits, in addition to significant injuries and damages, including lost future earnings and earning capacity, and expenses for past and future medical and psychological care.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment in their favor and against all Defendants; damages to compensate them for injuries including personal injury, mental anguish and distress, emotional anguish and distress, physical pain and suffering, lost wages and earning capacity, medical expenses and future medical expenses, punitive damages, attorney fees and costs, pre- and post-judgment interest and any other relief this Court may deem necessary and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

EGOLF + FERLIC +
MARTINEZ + HARWOOD, LLC

/s/ Kate Ferlic
Kate Ferlic
Brian Egolf
Kristina Martinez
Ben Osborn
123 W. San Francisco Street, Second Floor
Santa Fe, New Mexico 87501
(505) 986-9641
Kate@EgolfLaw.com
Brian@EgolfLaw.com
KMartinez@Egolflaw.com
Ben@EgolfLaw.com
*Attorneys for Plaintiffs*