## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JANE DOE 1, *et al.*,

     Plaintiffs,

v.                                             Civ. No. 23-362 GBW/JHR

EASTERN NEW MEXICO UNIVERSITY
BOARD OF REGENTS, *et al.*,

     Defendants,

and

FOREMOST INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN,

     Plaintiff-in-Intervention,

v.

MEGHAN DE LOS REYES, *et al.*,

     Defendants-in-Intervention,

and

JANE DOE 1, *et al.*,

     Involuntary Defendants-in-Intervention.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT EASTERN
NEW MEXICO UNIVERSITY BOARD OF REGENTS' MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT ON COUNT VII OF PLAINTIFFS' FIRST AMENDED COMPLAINT**

THIS MATTER comes before the Court on Defendant Eastern New Mexico University Board of Regents' Motion for Summary Judgment on All Claims in Counts I, V, and VII and Supporting Memorandum ("Defendant's Motion"), *doc. 181*, and Plaintiffs' Motion for Partial Summary Judgment on Count VII of Plaintiffs' First Amended Complaint ("Plaintiffs' Motion"), *doc. 219*.  Having reviewed the Motions and their attendant briefings, *docs. 217, 238, 243, 258*, and the parties' oral arguments, *doc. 296*, the Court GRANTS Defendant's Motion IN PART as to Plaintiffs' Title IX claim, DENIES Defendant's Motion IN PART as to Plaintiffs' state law tort claim based upon a declination of supplemental jurisdiction, and DENIES Plaintiff's Motion.[1]

## I.    BACKGROUND

Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 (collectively, "Plaintiffs") attended Eastern New Mexico University ("ENMU") in Portales, New Mexico, during the 2022-2023 academic school year and were members of the ENMU women's basketball team.  Defendant's Statement of Material Fact ("DMF") 2.  Defendant Eastern New Mexico University Board of Regents ("ENMUBOR") is a public body and governmental entity operating as an instrumentality of the State of New Mexico.  DMF 1.  ENMU is a recipient of federal funding.  Plaintiffs' Statement of Undisputed Facts

---

[1] Defendant Eastern New Mexico University Board of Regents ("ENMUBOR") also moves for summary judgment on Plaintiffs' claim under the New Mexico Civil Rights Act ("NMCRA").  *See doc. 181* at 21-25.  However, on October 31, 2024, pursuant to the parties' agreement, the Court dismissed Plaintiffs' NMCRA claim without prejudice, permitting Plaintiffs to refile the claim in any New Mexico state court of proper venue.  *See doc. 246* at 2.  Because the NMCRA claim is no longer before this Court, Defendant ENMUBOR's request for summary judgment on that claim is moot and will not be addressed.

("PUF") 1. Plaintiffs initiated this case on April 27, 2023, *see doc. 1*, and filed the operative First Amended Complaint for Damages on August 23, 2023, *see doc. 47*, bringing claims for sexual abuse perpetrated against them during the 2022-2023 school year by Defendant Glen de los Reyes, the husband of Defendant Meghan de los Reyes, who was the head coach of the ENMU women's basketball team at the time. *See generally doc. 47*. Relevant to the instant Motions, Plaintiffs bring claims against Defendant ENMUBOR for sexual discrimination and retaliation in violation of Title IX. *Id.* ¶¶ 161-74.

Defendant ENMUBOR filed its Motion on August 22, 2024, requesting the Court to enter summary judgment in their favor on all of Plaintiffs' claims against them. *Doc. 181*. Plaintiffs filed their response to Defendant's Motion on September 27, 2024. *Doc. 217*. Defendant ENMUBOR's Motion was fully briefed on October 29, 2024, *doc. 245*, with the filing of its reply, *doc. 243*.

Plaintiffs filed their Motion on October 1, 2024, requesting the Court to enter summary judgment in their favor on their Title IX claim against Defendant ENMUBOR. *Doc. 219*. Defendant ENMUBOR filed its response to Plaintiffs' Motion on October 22, 2024. *Doc. 238*. Plaintiffs' Motion was fully briefed on November 5, 2024, *doc. 280*, with the filing of their reply, *doc. 258*.

## II.    LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

The court's role is not to weigh the evidence or determine credibility, but rather merely to assess whether a genuine issue exists as to material facts requiring a trial. *See Anderson*, 477 U.S. at 249, 255. "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id.* at 257. Furthermore, the court must resolve reasonable inferences and doubts in favor of the non-moving party, and construe evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 551-54 (1999). However, "viewing the evidence in the light most favorable to the nonmovant, it is not enough that the evidence be merely colorable or anything short of significantly probative." *Hall v.*

*Bellmon,* 935 F.2d 1106, 1111 (10th Cir. 1991) (internal quotations omitted); *see also Anaya*

*v. CBS Broad. Inc.*, 626 F. Supp. 2d 1158, 1197 (D.N.M. 2009) ("The mere existence of a

scintilla of evidence will not avoid summary judgment.").  As with any fact asserted by

a party in a summary judgment motion, the nonmovant must point the Court to such

support by "citing to particular parts of materials in the record."  Fed. R. Civ. P.

56(c)(1)(A).  Further, all material facts set forth in the motion and response which are

not specifically controverted are deemed undisputed.  D.N.M.LR-Civ. 56.1(b).

### III.    UNDISPUTED MATERIAL FACTS ("UMFS")

Based on the record before it, the Court finds the following material facts to be

undisputed for purposes of the Motions.[2]

1. Defendant ENMUBOR is a public body, an instrumentality of the State of
   New Mexico, and a governmental entity.  ENMU is a recipient of federal
   funding.  Defendant's Statement of Material Fact ("DMF") 1; Plaintiffs'
   Statement of Undisputed Facts ("PUF") 1.

2. Plaintiffs were enrolled as students at ENMU during the 2022-2023 academic
   year and were members of the University's women's basketball team under
   the leadership of Head Coach Meghan de los Reyes ("Defendant Meghan").
   DMF 2-3.

---

[2] Where the Court cites to a party's statement of fact, it does so pursuant to Federal Rule of Civil
Procedure 56(c)(1) because the evidence cited by the party for that fact supports the Court's finding and,
if the other party has disputed this fact, the evidence cited by that party does not genuinely dispute that
finding.  Where the Court cites to evidence in the record, it does so pursuant to Rule 56(c)(3), which
permits consideration of "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

3. Each Plaintiff was suspended by Defendant Meghan from the women's basketball team in some capacity during the Fall 2022 semester. Defendant Meghan maintains that Plaintiff Jane Doe 1 was suspended for breaking the expectations of the team. Plaintiff Jane Doe 2 was suspended from one practice for shoplifting at Walmart, a suspension she considered fair. Defendant Meghan maintains that Plaintiff Jane Doe 3 was suspended from team activities for four days in mid-October for breaking the expectations of the team. Defendant's Additional Statements of Fact ("DASF") GG, II-JJ, MM; *doc. 211-1* at 14, 162:11-163:20; *doc. 239-13*.

4. At all relevant times, Glen de los Reyes ("Defendant Glen") was Defendant Meghan's husband. Defendant Glen was not an employee, contractor, or student of ENMU. DMF 4; *doc. 249-10* at 7, 59:21-23.

5. Defendant Glen holds a Bachelor of Arts degree in Exercise and Sports Science with an emphasis in Athletic Training. He has been certified in Muscle Activation Technique ("MAT") since 2004. The MAT method is a therapeutic technique designed to identify and correct muscular imbalances and weaknesses. *Doc. 180-1* at 5, 29:12-15; *id*. at 6, 32:11-18; *id*. at 9, 78:25-79:2.

6. During Defendant Meghan's employment at ENMU, Defendant Glen offered to provide treatment services to ENMU student-athletes free of charge. Initially, Defendant Glen occasionally provided these services on ENMU's campus between August or September 2021 and January 2022. Beginning in January 2022, Defendant Glen began conducting treatment sessions solely at his private residence. *Doc. 211-7* at 2, 71:13-72:12; *id*. at 3, 77:23-25; *id*. at 6-7, 93:2-94:2; *doc. 174-6* at 4, 139:3-6; Plaintiffs' Response to ENMU's Statement of Facts 54.

7. While members of the ENMU women's basketball team and at the recommendation of Defendant Meghan, Plaintiffs all sought treatment from

Defendant Glen.  Plaintiffs received these services free of charge at Defendant Glen and Meghan's off-campus private residence.  PUF 29; Plaintiffs' Response to ENMU's Statement of Facts 54; *doc. 172-19* at 2, 226:7-13; *doc. 172-18* at 6, 246:11-16; *doc. 186-6* at 5, 75:13-16.

8. Plaintiff Jane Doe 1 attended eight treatment sessions with Defendant Glen between August and October 2022.  Plaintiff Jane Doe 2 attended four sessions between late August or early September and October 2022.  Plaintiff Jane Doe 3 attended one session in August 2022.  Each Plaintiff alleges that Defendant Glen sexually assaulted them during the course of his treatment.  *Doc. 174-9* at 7, 162:10-12; *doc. 239-11* at 3, 185:15-17; *doc. 174-11* at 4, 82:20-83:1; *doc. 204-1* at 13, 112:11-14; *doc. 206-1* at 10-11, 149:22-150:4; *doc. 186-6* at 5, 74:1-6; PUF 30.

9. Sometime in October 2022, Plaintiff Jane Doe 3 told an ENMU athletic trainer, Danielle Torossi ("Torossi"), that she never wanted to go back to Defendant Glen for treatment because he had touched her vagina.  Torossi immediately went to ENMU Athletic Director Paul Weir ("Defendant Weir") and stated that ENMU was going to have a "Larry Nassar case if something[] [was] not done."  DMF 40; *doc. 218-1* at 3, 272:21-25.

10. After Torossi's report that ENMU was going to have a Larry Nassar case if something was not done, Defendant Weir scheduled a meeting for November 2, 2022, with ENMU athletics staff, Defendant Glen, Defendant Meghan, and the ENMU team physician Dr. Joel Sievers.  The stated purpose of the meeting was to discuss athletic training and strength and conditioning support for the women's basketball program, as well as the involvement of outside personnel.  *Doc. 172-1* at 10, 155:18-156:10; *doc. 174-5* at 21.

11. During the November 2, 2022, meeting, Defendant Weir informed Defendant Glen that he did not have permission to provide treatment to student-athletes unless he formalized a professional relationship with ENMU or otherwise

received prior permission from the school's training staff. Defendant Weir further indicated that ENMU was open to formalizing such a relationship. *Doc. 183-1* at 19, 227:13-16; *doc. 218-4* at 6-10; *doc. 172-1* at 13, 171:6-15; *id.* at 14, 189:8-21; *doc. 174-5* at 18, 147:21-24.

12. Despite understanding that he was being instructed to cease treating student-athletes unless he formalized a professional relationship with ENMU or obtained prior approval from the University's training staff, Defendant Glen continued to treat ENMU student-athletes at his private residence without such a relationship or permission. On November 8, 2022, an ENMU athletics coach texted Defendant Glen requesting that he see one of his student-athletes. Defendant Glen responded asking the coach whether he should "follow the rules or not, because if I follow the rules then [an ENMU athletic trainer] has the control over who I see, if she approves it then I can [see] them, or do I just continue to see players and not tell them?" During this conversation, Defendant Glen stated: "I'm down to see [the student-athlete], I'm fine with it…" Defendant Glen ultimately saw this student-athlete for treatment without any approval from Defendant Weir or ENMU training staff. *Doc. 218-4* at 6-10; *doc. 218-8* at 5, 243:10-244:19; *doc. 174-5* at 19, 153:13-16.

13. On November 6, 2022, Defendant Weir sent Defendant Glen a follow-up email stating that he intended to draft an initial proposal for Defendant Glen's review regarding his formal relationship with ENMU before submitting it to his superiors at ENMU. *Doc. 172-13* at 2.

14. On November 16, 2022, Defendant Glen declined the invitation to formalize a professional relationship with ENMU. In response, Defendant Weir reiterated that ENMU could not approve of Defendant Glen "working with any ENMU student[-]athletes in a professional setting." *Doc. 172-13*.

8

15. Sometime in November 2022, Plaintiff Jane Doe 3 disclosed to her counselor that Defendant Glen had touched her groin during treatment.  The counselor reported this to ENMU's Vice President of Student Affairs, who then relayed the information to ENMU's Human Resources ("HR") Director, Benito Gonzales ("Gonzales").  HR started an investigation into the allegations against Defendant Glen on December 7, 2022.  *Doc. 249-10* at 6, 55:4-8; *id*. 56:22-25; *doc. 249-13* at 3; *doc. 175-15* at 4.

16. Sometime at the end of January 2023, Plaintiff Jane Doe 1 reported to ENMU Strength and Conditioning Coach Charles Kenward ("Kenward") that Defendant Glen had inappropriately touched her during her treatment with him.  Kenward then relayed her report to HR.  *Doc. 211-15* at 3, 186:13-22; *id.,* 189: 1-17; *doc. 172-18* at 2-3, 225:22-226:3; *doc. 172-17* at 2-3, 25:19-26:7; *id*. at 3, 29:6-24.

17. On the morning of January 31, 2023, Defendant Meghan learned of the allegations against Defendant Glen after receiving a phone call from a parent of one of the women's basketball players.  The parent's child had overheard Plaintiffs Jane Doe 1 and Jane Doe 2 discussing being inappropriately touched during their treatments with Glen.  *Doc. 175-8* at 9, 99:15-101:4.

18. On January 31, 2023, Defendant Meghan met individually with Plaintiffs Jane Doe 1 and Jane Doe 2 to discuss allegations she had heard from the parent of another women's basketball player.  Assistant Coach Yaremi Mejia ("Mejia") was also present for both meetings.  Defendant Meghan asked each Plaintiff similar questions, including whether they felt uncomfortable with Defendant Glen's treatment, whether he had ever touched them inappropriately, and whether they had anything to report.  Defendant Meghan also informed them that she intended to speak with their parents about the allegations and the conversations.  During her meeting with Plaintiff Jane Doe 1, Defendant

9

Meghan stated that she had excluded a male assistant coach from the discussion because she felt it was "a female conversation."  Defendant Meghan also told Jane Doe 1 to not "ever feel uncomfortable" coming to her to talk.  *Doc. 175-8* at 10-11, 103:16-109-6; *doc. 216-2* at 11, 191:11-19; *id*. 192:20-21.

19. During her January 31, 2023, conversation with Defendant Meghan and Assistant Coach Mejia, Plaintiff Jane Doe 1 stated that she had nothing to report and told Defendant Meghan to direct her questions to her parents. *Doc. 175-8* at 10, 104:19-105:10; *doc. 216-2* at 11, 192:17-18.

20. During her January 31, 2023, conversation with Defendant Meghan and Assistant Coach Mejia, Plaintiff Jane Doe 2 similarly stated that she had nothing to report but described Defendant Glen's treatment practices as uncomfortable and unusual.  Plaintiff Jane Doe 2 first reported that Defendant Glen had inappropriately touched her to ENMU officials on February 1, 2023, during a conversation with ENMU HR Director Gonzales—the day after her meeting with Defendant Meghan and Assistant Coach Mejia.  *Doc. 175-8* at 10, 105:15-21; *doc. 174-10* at 8, 237:3-22; *id*. at 9, 238:15-17; *id*. at 11-12, 316:24-318:7; *doc. 175-15* at 8-9.

21. On February 9, 2023, after learning that Defendant Glen may have still continued providing services to student-athletes at his home, Defendant Weir sent an email to all ENMU athletic coaches reiterating that "student-athletes are [] NOT permitted any treatment/services from Glen de los Reyes."  *Doc. 259-1*, at 2 62:12-63:4; *doc. 249-14*.

22. On February 19, 2023, with two games left in the season, Defendant Meghan emailed Defendant Weir indicating that she wanted to suspend Plaintiff Jane Doe 3 indefinitely from all team activities due to conduct that had "proven detrimental" to the well-being of the women's basketball team.  However, the

suspension was not implemented because Plaintiff Jane Doe 3 independently decided not to play in the penultimate game and started and played in the last game of the season on February 23, 2023. *Doc. 221-15*; DASF NN-PP.

## IV. ANALYSIS

Title IX provides, in relevant part, "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving financial assistance. . ." 20 U.S.C. § 1681(a). The provisions of Title IX are enforceable through an implied private right of action which encompasses actions for damages against a university. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 65, 76 (1992). Here, it is undisputed that Defendant is subject to the requirements of Title IX based on its receipt of federal funding. UMF 1.

Both Plaintiffs and Defendant ENMUBOR move for summary judgment on Plaintiffs' Title IX claim. The parties' discrimination dispute turns on three key issues: (1) whether ENMU exercised substantial control over Defendant Glen and the context of Plaintiffs' harassment; (2) whether ENMU had actual knowledge that Defendant Glen posed a substantial risk of sexual harassment to its students before Plaintiffs' assaults; and (3) whether ENMU's response to Plaintiffs' allegations of sexual harassment constituted deliberate indifference. The parties' retaliation dispute centers on whether Defendant Meghan retaliated against Plaintiffs for reporting Defendant Glen's conduct. The Court dismisses Plaintiffs' Title IX claim with prejudice because no reasonable jury

could find that ENMU exercised substantial control over Defendant Glen or that

Defendants' response to Plaintiffs' reports of Defendant Glen's conduct constituted

materially adverse school-related actions.

### A. Title IX Discrimination

Title IX provides that a recipient of federal financial assistance may not "on the

basis of sex, . . . exclude[] from participation in, . . . [deny] the benefits of, or . . . [subject]

to discrimination under any education program or activity" any person in the United

States.  20 U.S.C. § 1681(a).  Title IX plaintiffs cannot impose liability on a school district

or other governmental entity based on vicarious liability or agency theories.  *See Davis*

*ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644 (1999).  Nonetheless,

Title IX imposes liability against recipients of federal funding when it displays

deliberate indifference to known acts of sexual harassment that cause such harassment.

*Id*. at 641-45.  Under the deliberate indifference theory, *inter alia*, a plaintiff must show

that "the recipient exercise[d] substantial control over **both** the harasser and the context

in which the known harassment occurs."  *Id*. at 645 (emphasis added).  "Only then can

the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it

'under' the recipient's programs."  *Id*.

"The Tenth Circuit also has recognized that the deliberate indifference standard

isn't the only way that a Title IX plaintiff can hold a defendant liable."  *Swearingen v.*

*Pleasanton Unified Sch. Dist. 344*, 641 F. Supp. 3d 1141, 1163 (D. Kan. Nov. 16, 2022).  A

Title IX plaintiff can also show that the defendant "violate[d] Title IX through an official policy, which can include a 'policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient.'" *Id.* (quoting *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007)); *cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) ("**[I]n cases . . . that do not involve official policy** of the recipient entity . . . a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the recipient's programs and fails to adequately respond.") (emphasis added).

The parties dispute whether Title IX applies to Plaintiffs' discrimination claims—specifically, whether the alleged harassment occurred within an "education program or activity" of the University under either of these theories. With respect to the "deliberate indifference" theory, this determination turns on whether ENMU exercised substantial control over Defendant Glen and the context in which the alleged misconduct occurred. Defendant ENMUBOR argues that it lacked substantial control over Defendant Glen because it had no authority to fire, discipline, suspend, or terminate him, as he was neither an employee nor a contractor of ENMU. *Doc. 181* at 29. Defendant ENMUBOR also argues that it lacked substantial control over the context of the harassment, as the alleged misconduct occurred at Defendant Glen's off-campus home. *Id.* Conversely,

Plaintiffs argue that ENMU exercised substantial control over Defendant Glen because it could restrict his access to its student-athletes.  *Doc. 217* at 22; *doc. 219* at 20-21. Plaintiffs further argue that ENMU exercised substantial control over the context of the harassment by facilitating it, as the University allowed Defendant Glen to treat student-athletes at his home.  *Doc. 219* at 21-24.  In the alternative, Plaintiffs argue that ENMU can be held liable under the "official policy" theory of *Simpson* because it "facilitated Defendant Glen's treatment of student-athletes in his home, while choosing to minimize its own oversight over the treatments."  *Id*.

       *i.*     *The Two Facets of Control Under the Deliberate Indifference Theory*

As noted above, under the deliberate indifference theory, *inter alia*, a plaintiff must show that "the recipient exercise[d] substantial control over **both** the harasser and the context in which the known harassment occurs."  *Davis*, 526 U.S. at 645 (emphasis added).  Consequently, "[c]ontrol over the harasser and the context in which the harassment occurs are two separate requirements . . ."  *Kinoff v. Colo. Sch. of Mines Bd. of Trustees*, 2023 WL 11898803 at *5 (D. Colo. Feb. 9, 2023).

Regarding the recipient's control over the harasser, the focus is on whether the harasser is subject to the university's disciplinary authority or some other power which can be brought to bear against the harasser.  *See Root v. Univ. of Utah*, 2023 WL 2346315 at *4 (D. Utah Mar. 3, 2023); *see also Davis*, 526 U.S. at 644-47 ("A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action. . .

[but] recipients of federal funding may be liable for 'subjecting' their students to

discrimination where the recipient is deliberately indifferent to known acts of student-

on-student harassment and the harasser is under the school's disciplinary authority.").

Regarding control over the context in which known harassment occurs, "[c]ourts focus

on whether the recipient owns or regulates the physical location, sponsors the event, or

hosts or facilitates the program or activity." *Root*, 2023 WL 2346315 at *5. Misconduct

occurring "during school hours and on school grounds" is an example of a

circumstance where a school exercises substantial control over the context of the

harassment. *Davis*, 526 U.S. at 646. However, a university may also exercise substantial

control over harassment that occurs off school property if a sufficient nexus exists

between the off-campus conduct and the institution. *See Rost ex rel. K.C. v. Steamboat

Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 n.1 (10th Cir. 2008).

> ii.    *Plaintiffs Have Not Established That ENMU Exercised Substantial
>        Control Over Defendant Glen*

As discussed earlier, a university exercises substantial control over a harasser

when the harasser is subject to its remedial measures and disciplinary authority. *See

Davis*, 526 U.S. at 646-47. In Title IX cases, individuals found to be subject to a school's

remedial measures and disciplinary authority are almost always students or employees.

*See Weckhorst v. Kansas State Univ.*, 241 F. Supp. 3d 1154, 1167-68 (D. Kan. 2017), aff'd

sub. nom. *Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019) ("The alleged

assailants are students at KSU, and thus they are under the disciplinary control of KSU.

Therefore, the Court finds that Plaintiff has alleged plausible facts demonstrating KSU had substantial control over the assailants[.]"); *see also T.R. v. Howard*, 2023 WL 7279336, *4-7 (D.N.M. Nov. 3, 2023) (finding that Title IX applied where the alleged harasser was a teacher employed by the school).  Nonetheless, in rare circumstances, courts have found a recipient to have sufficient control over a third-party to support Title IX liability.  *See, e.g. Hall v. Millersville Univ.*, 22 F.4th 397 (3d Cir. 2022); *Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018); *Doe v. Defendant A*, 2012 WL 6694070 (N.D. Okla. Dec. 21, 2012); *but see Santiago v. Puerto Rico*, 655 F.3d 61 (1st Cir. 2011) (plaintiff failed to state a plausible Title IX claim because she did not allege that the school principal or any other school employee had authority to take corrective action against the alleged harasser—a bus driver employed by a private company under contract with the Department of Education); *see also Spencer v. Univ. of New Mexico Bd. of Regents*, 2016 WL 10592223, at *4 n.1 (D.N.M. Jan. 11, 2016) (applying Title IX analysis to "on and near campus" harassment involving three perpetrators—two students and one non-student—and recognizing Plaintiff's acknowledgement that Defendant did not have disciplinary control over the non-student "such that it could be held liable for its response to learning that he was one of the perpetrators of the rapes.") (citing *Davis*, 526 U.S. at 646-47).

As Defendant Glen was not a student, employee or contractor of ENMU, he was not subject to their ordinary disciplinary authority.  Plaintiffs argue that he was still

subject to their control because they could bar him from ENMU property, prevent

coaches from referring student-athletes to him, and regulate his provision of services to

ENMU student-athletes. *Doc. 217* at 22. With respect to the ability to bar him from

campus, the Court recognizes that it was the recipient's ability to regulate access to on-

campus property for guests and the ability to bar a third-party from campus that was

found to satisfy the "control of the harasser" element in *Hall.* 22 F.4th at 409. However,

in *Hall*, the assault of the plaintiff occurred on campus meaning that the failure to bar

the harasser could have contributed to the subsequent assault and murder. *Id*. This

causal connection is also present in the other cases where courts have found sufficient

control of a third-party harasser. *See, e.g., Feminist Majority Found.*, 911 F.3d at 680-84,

688-89 (harassing messages were being made over university's wireless network and

university could have identified and barred individuals who were making the posts);

*Doe*, 2012 WL 6694070 at *5 (denying motion to dismiss where sexual abuse of minor by

therapist not employed by school occurred on school property and during school hours

because school could have barred therapist from school grounds and prohibited the

minor from attending counseling sessions during school hours). Here, the alleged

assaults of Plaintiffs all occurred off-campus at Defendant Glen's private residence.

UMFs 7-8. A failure to bar him from campus cannot be said to have caused the assaults.

Second, although ENMU could direct its coaches to stop referring student-athletes to

Defendant Glen for treatment at his private residence and could instruct student-

athletes to refrain from seeking treatment from him, such actions reflect the University's

control over its employees and students—not over Defendant Glen himself.  Finally,

with respect to regulating his provision of services to ENMU student-athletes, ENMU

simply lacked that power.  As long as it was happening off-campus, ENMU had no

authority to prevent Defendant Glen from treating any ENMU student.  For that matter,

ENMU lacked the authority to prohibit its adult students from receiving treatment from

him.  Plaintiffs point out that Defendant Weir attempted at some point to announce

such prohibitions but that does not change the fact that ENMU lacked the authority to

enforce them.

 In fact, the lack of actual and substantial control of Defendant Glen's treatment of

ENMU students was evidenced by his repeated noncompliance with multiple

instructions from ENMU officials to cease treating student-athletes at his home.  On

November 2, 2022, Defendant Weir informed Defendant Glen that he did not have

permission to treat student-athletes unless he formalized a relationship with ENMU or

otherwise received prior permission from the school's training staff.  UMF 11.

Defendant Glen understood this statement as a direct prohibition.  UMFs 11-12.  Despite

this directive, Defendant Glen continued to provide treatment to student-athletes.  UMF

12.  His disregard for Defendant Weir's instruction is evidenced by a November 8, 2022,

text message from Defendant Glen to an ENMU athletic coach, in which he asked the

coach whether he should "follow the rules or not."  *Id*.  In this conversation, Defendant

Glen also asked, "do I just continue to see [student-athletes] and not tell [ENMU staff]?" *Id*. He also indicated his willingness to see the student-athlete the coach asked him to see. *Id*. Ultimately, Defendant Glen saw this student-athlete for services at his private residence without formalizing a relationship with ENMU or receiving prior permission from the school's training staff. *Id*. Subsequently, on November 17, 2023, after Defendant Glen declined ENMU's offer to formalize a relationship, Defendant Weir reiterated via email that ENMU could not "approve of [him] working with any ENMU student-athletes in a professional setting." UMF 14. Indeed, the record supports the conclusion that Defendant Glen continued treating student-athletes after this email. UMF 21.

Several of Plaintiffs' arguments on the "control" issue could support a finding that ENMU exercised substantial control over the context in which the alleged misconduct occurred. Even though the alleged harassment occurred off-campus by a third-party, the treatment was related to Plaintiffs' status as ENMU basketball players and was encouraged by their coach. UMF 7. Nonetheless, these facts do not establish control over Defendant Glen. As previously established, a university's control over the harasser and its control over the context of the harassment are distinct considerations which cannot be conflated. *Supra*. p. 13-15. Because no reasonable jury could conclude that Defendant Glen was subject to ENMU's remedial or disciplinary authority for his

conduct at his private residence, Plaintiffs' harassment did not occur within a program or activity of ENMU under the "deliberate indifference" theory of liability under *Davis*.

>    iii.    *Plaintiffs Have Not Established Title IX Liability Under a Simpson "Official Policy" Theory*

In *Simpson*, the Tenth Circuit also made clear that a recipient can be liable under Title IX for the actions of third parties through an official policy, which can include a "policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient."  500 F.3d at 1178.  In *Simpson*, the plaintiffs were sexually assaulted by University of Colorado at Boulder ("UCB") football players and high school students who were visiting UCB as part of a football recruiting visit.  *Id*. at 1173.  The plaintiffs demonstrated that the UCB football recruiting efforts included showing recruits a "good time" by pairing them with female "Ambassadors" to escort them around campus.  *Id*. at 1180.  Some recruits were even promised opportunities to have sex.  *Id*. 1173.  At the time of the assaults on plaintiffs, UCB had been made aware of the risks of sexual assault arising from unsupervised recruiting practices.  Those warnings included a prior incident in which football recruits were involved in a sexual assault, prompting a local district attorney to meet with top UCB officials and urge the university to implement supervision policies and sexual assault prevention training for football players.  *Id*.  Nevertheless, UCB made little effort to change its policies or training in response.  *Id*.  Moreover, the coaching staff was made aware of sexual harassment and

assault by players but responded in ways "more likely to encourage than eliminate such misconduct." *Id*. at 1173-74. In addressing the egregious conduct of UCB officials—who "sanctioned, supported, [and] even funded a program (showing recruits a 'good time') that, without proper control, would encourage young men to engage in opprobrious acts"—the Tenth Circuit concluded that Title IX liability can attach "when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary[.]" *Id*. at 1178. The *Simpson* court distinguished the "official policy" theory of liability from the theory of liability discussed in *Gebser* and *Davis* which did not involve an "element of encouragement of the misconduct by the school district." *Id*. at 1177.

Here, Plaintiffs argue that like UCB in *Simpson*, ENMU exercised significant control over the harasser and the environment in which the harassment occurred because the context and location in which Plaintiffs were assaulted "arose from and was facilitated by ENMU policy." *Doc. 219* at 24. Specifically, Plaintiffs contend that it was ENMU policy to encourage student-athletes to seek treatment from Defendant Glen at his home while choosing to minimize its own oversight of the treatment. *Id*. Even assuming the truth of Plaintiffs' assertions to this extent, the facts do not remotely approach the "official policy" theory of liability recognized in *Simpson*:

> The deliberate-indifference-to-obvious-need-for-training standard adopted by the Tenth Circuit in *Simpson* for Title IX claims is confined to circumstances where a federal funding recipient sanctions a specific program that, without proper control, would encourage sexual harassment and abuse such that the need for

training or guidance is obvious.  In that situation, the failure amounts to an official policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of the program.

*C.T. v. Liberal Sch. Dist.*, 562 F. Supp.2d 1324, 1139-40 (D. Kan. June 10, 2008).

Encouraging student-athletes to seek treatment from Defendant Glen for injuries affecting their ability to participate in sports does not, on its own, promote an environment conductive to sexual harassment or abuse such that the need for training or guidance would be obvious.  *C.T.* is illustrative.  There, student-athletes were sexually abused and harassed by a volunteer weight-training coach.  *Id.* at 1329-30.  The plaintiffs argued that the "school district acted with deliberate indifference by establishing policies, procedures, and practices that caused or promoted an environment or program in which sexual abuse, harassment, and/or retaliation of students occurred or by acting with deliberate indifference to providing training and guidance that was obviously necessary for the implementation of school athletic programs."  *Id.* at 1137.  The *C.T.* Court rejected that argument and distinguished the case from *Simpson*, emphasizing that a school-sponsored weight training program run by a volunteer coach was fundamentally different from UCB's practice of providing football recruits with a "good time."  *Id.* at 1340.  The Court explained that "a mere weight training program does not bear the element of encouragement of misconduct by the school district," and that "[a] rational trier of fact could not find based on the summary judgment record that the very operation of a weight training program created

a risk of abuse that would have been so obvious to school officials." *Id*.  The same reasoning applies here.  Like the volunteer-run weight training program in *C.T.*, encouraging student-athletes to seek treatment from Defendant Glen for sports-related injuries does not, in itself, create an environment that promotes or encourages sexual misconduct such that the need for training or guidance is obvious.

In conclusion, based on the record before the Court, no reasonable jury could find that Plaintiffs have established an "official policy" theory of Title IX liability for ENMU.  As they also cannot establish a "deliberate indifference" theory of liability as explained above, Plaintiffs' discrimination claim under Title IX fails.  The Court will now turn to Plaintiffs' Title IX retaliation claim, which is based on alleged direct retaliatory conduct by Defendant ENMUBOR through its employee, Defendant Meghan.

### B.  Title IX Retaliation

Retaliation for reporting sex discrimination constitutes intentional discrimination on the basis of sex in violation of Title IX.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005); *Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1310 (10th Cir. 2020) ("An allegation that the plaintiff was harassed for reporting misconduct can therefore suffice to state a claim for discrimination on the basis of sex if the misconduct reported is itself sex discrimination.").  In the Tenth Circuit, the *McDonnell Douglas* burden shifting framework applies to Title IX retaliation claims.  *Hiatt v. Colorado*

23

*Seminary*, 858 F.3d 1307, 1315 & n.8 (10th Cir. 2017). The *McDonnell Douglas* burden-

shifting framework provides a method of proving discrimination by circumstantial or

indirect evidence, where direct evidence is unavailable. *Doe v. Univ. of Denver*, 1 F.4th

822, 829 (10th Cir. 2021). Under this framework, a plaintiff bears the initial burden of

establishing a prima facie case for discrimination. *Texas Dep't of Cmty. Affs. v. Burdine*,

450 U.S. 248, 253 (1981).

A prima facie case for retaliation under Title IX has four elements: (1) the plaintiff

engaged in protected activity, (2) the defendant had knowledge of the protected

activity, (3) materially adverse school-related action was taken against the plaintiff, and

(4) a causal connection exists between the protected activity and the adverse action. *See*

*Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 645 F. Supp. 3d 1134, 1161 (D.

Kan. Dec. 9, 2022), *aff'd Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 94 F.4th

936 (10th Cir. 2024). When Plaintiff has established a prima facie case, the burden shifts

to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse action.

Defendant's burden at this stage is a burden of production, not persuasion. *Burdine*, 450

U.S. at 254-55. Upon the assertion of a legitimate, nondiscriminatory reason, the burden

returns to Plaintiff to show that Defendant's proffered reason is pretextual. *Id.* at 256.

Plaintiff's burden at this stage "merges with [her] ultimate burden of persuading the

court that she has been the victim of intentional discrimination. She may succeed in this

either directly by persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

Plaintiffs assert their Title IX retaliation claims against Defendant ENMUBOR based on conduct by Defendant Meghan. Plaintiffs Jane Doe 1 and Jane Doe 2 allege that their Fall 2022 suspensions from the team, as well as individual conversations with Defendant Meghan and Assistant Coach Yaremi Mejia following Defendant Meghan's discovery—via a basketball parent—of their allegations against Defendant Glen, constitute retaliatory acts. *Doc. 219* at 26. Plaintiff Jane Doe 3 bases her retaliation claim on Defendant Meghan's tone and body language toward her, her reduced playing time, and her suspensions from the women's basketball team. *Id.*; *doc. 258* at 10. All three Plaintiffs further contend that ENMU, through Defendant Weir, was aware that student-athletes refrained from participating in investigations or reporting Defendant Glen's conduct out of fear of retaliation by Defendant Meghan. *Doc. 219* at 26.

Here, the record establishes that Plaintiffs engaged in protected activity by reporting sexual harassment to ENMU employees. Reporting sexual assault or harassment qualifies as protected activity under Title IX. *See Kincaid*, 645 F. Supp.3d at 1161 (citing *Douglass v. Garden City Cmty. Coll.*, 543 F. Supp. 3d 1043, 1054 (D. Kan. 2021)). Accordingly, the first two elements of their prima facie case are not in dispute with respect to any conduct that occurred **after** they reported Defendant Glen's behavior. However, Plaintiffs fail to establish that they engaged in protected activity

before their individual reports of sexual harassment and assault by Defendant Glen.

Nonetheless, Plaintiffs support their retaliation claims with conduct which occurred

both before and after they made their reports.  As such, the Court must determine the

timing of each Plaintiffs' initial protected activity to assess which alleged conduct may

properly be considered in evaluating their retaliation claims.

Plaintiff Jane Doe 3 made the earliest report in October 2022, when she informed

Torossi that she did not want to return to Defendant Glen for treatment because he had

touched her vagina.  UMF 9.  Thus, the relevant alleged retaliatory actions for Plaintiff

Jane Doe 3 include her mid-October suspension, the proposed suspension in February,

and Meghan's tone and body language toward her.  Plaintiff Jane Doe 1 first reported

Glen's conduct in late January 2023, when she disclosed to Charles Kenward that

Defendant Glen had inappropriately touched her.  UMF 16.  Thus, the relevant alleged

retaliatory action for Plaintiff Jane Doe 1 is her January 31, 2023, conversation with

Defendant Meghan and Assistant Coach Mejia.  Plaintiff Jane Doe 2 reported Defendant

Glen's conduct on February 1, 2023.  UMF 20.  Because all of the conduct she identifies

as retaliatory occurred prior to that date, it does not qualify as retaliation under Title IX.

Nevertheless, the Court will address Plaintiff Jane Doe 2's conversation with Defendant

Meghan and Assistant Coach Mejia for the sake of completeness.[3]

---

[3] This conclusion means that the Fall 2022 suspensions of Jane Doe 1 and Jane Doe 2 were not retaliatory as a matter of law.  *See* UMF 3.

Defendant ENMUBOR contends that Plaintiffs have not established a prima facie case for Title IX retaliation because they cannot satisfy the third element— *i.e.*, because they fail to establish that Defendants took action against them that could be considered "materially adverse." *Doc. 238* at 31-34.  An action is "materially adverse" if it is "sufficiently severe or pervasive that it could well dissuade a reasonable [person] from engaging in protected activity." *Kincaid*, 645 F.Supp.3d at 1162 (citation omitted) (applying the legal standard from *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006), to a Title IX retaliation claim).  Whether an action is materially adverse is judged from an objective standpoint. *Burlington*, 548 U.S. at 68-69.  Therefore, it does not take account of a plaintiff's "unusual subjective feelings." *Id.*  However, whether an action is materially adverse must be determined in view of the particular context in which it was taken, because "an 'act that would be immaterial in some situations is material in others.'" *Id.* at 69 (quoting *Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)); *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (stating in the context of a Title VII case that whether an action is materially adverse is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances") (quoting *Burlington*, 548 U.S. at 71).

For the reasons set forth below, the Court agrees with Defendant ENMUBOR and concludes that no reasonable factfinder could determine that Plaintiffs experienced materially adverse school-related actions as a result of engaging in protected activity.

> i.    *Absence of Materially Adverse School-Related Action Toward Jane*
> *Doe 1 Following Report of Glen's Conduct*

The Court finds that no reasonable factfinder could conclude that the January 31, 2023, conversation between Defendant Meghan, Assistant Coach Mejia, and Plaintiff Jane Doe 1 was sufficiently severe to dissuade a reasonable person in Plaintiff's position from reporting sex discrimination.  Plaintiffs do not even attempt to explain how the conversation constituted a materially adverse school-related action; they merely assert that Defendant Meghan "confronted" Plaintiffs Jane Doe 1 and Jane Doe 2 by initiating the discussion.  *See doc. 219* at 26.  However, a mere conversation addressing a report of sexual assault does not, by itself, amount to a materially adverse action.  *See T.R.*, 2023 WL 7279336, at *9 ("Any person [reporting sex discrimination] will understand that reporting will inevitably involve the uncomfortable circumstance of describing personal and sensitive events. . .").

Although the Court acknowledges the circumstances of the conversation were unusual—given that the allegations involved Defendant Meghan's husband—they are not sufficient to deter a reasonable person from reporting.  Even when viewed in the light most favorable to Plaintiffs, the record indicates that Defendant Meghan initiated the meeting to understand the nature of the allegations and determine whether they needed to be reported, not to retaliate against Plaintiff Jane Doe 1.  At the time, Defendant Meghan had learned of the allegations only hours earlier from the parent of another women's basketball player and was unaware that Plaintiff Jane Doe 1 had

already reported Defendant Glen's conduct to Charles Kenward. UMF 17. At the outset of the meeting, Defendant Meghan explained that she had excluded another assistant coach because he was male, and she believed the conversation should occur among women. UMF 18. Plaintiff Jane Doe 1 stated during the conversation that she had nothing to report and directed Defendant Meghan to address any further questions to her parents. UMF 19. Defendant Meghan then indicated that she planned to inform Plaintiff Jane Doe 1's parents about the allegations and the discussion. UMF 18. Before concluding, Defendant Meghan told Plaintiff Jane Doe 1, "don't ever feel uncomfortable coming to me." *Id*. Nothing in the record, including the foregoing facts, suggests that the conversation was retaliatory or so severe that it would have dissuaded a reasonable person in Plaintiff Jane Doe 1's position from reporting sex discrimination.

  ii. *Absence of Materially Adverse School-Related Action Toward Jane Doe 2 Following Report of Glen's Conduct*

   The basis of Plaintiff Jane Doe 2's retaliation claim—the conversation with Defendant Meghan and Assistant Coach Mejia—occurred prior to her protected activity, namely, her report of sex discrimination on February 1, 2023. UMFs 18, 20. Nevertheless, evening assuming arguendo that her protected activity began when a parent of another women's basketball player informed Defendant Meghan of the allegations her daughter had heard, the conversation, like that involving Plaintiff Jane Doe 1, was not sufficiently severe to dissuade a reasonable person in Plaintiff Jane Doe 2's position from reporting sex discrimination.

The record reflects that Defendant Meghan posed to Plaintiff Jane Doe 2 the same questions she asked Plaintiff Jane Doe 1. UMF 18. In response, Plaintiff Jane Doe 2 stated that she had nothing to report but described Defendant Glen's treatment practices as uncomfortable and unusual. UMF 20. Defendant Meghan similarly indicated that she intended to inform Plaintiff Jane Doe 2's parents about the allegations and the substance of their conversation. UMF 18. Nothing in the record, including the foregoing facts, suggests that the conversation was retaliatory or sufficiently severe to deter a reasonable person in Plaintiff Jane Doe 2's position from engaging in protected activity.

       iii.    *Absence of Materially Adverse School-Related Action Toward Jane Doe 3 Following Report of Glen's Conduct*

The Court finds that no reasonable factfinder could determine that any of Defendant Meghan's alleged conduct toward Plaintiff Jane Doe 3 was sufficiently severe or materially adverse to dissuade a reasonable person in her position from reporting sex discrimination. Foremost, Plaintiff Jane Doe 3 fails to explain how any of Defendant Meghan's actions constituted materially adverse school-related conduct. In any event, the Court finds that none rise to that level.

First, Defendant Meghan maintains that Plaintiff Jane Doe 3's four-day suspension in mid-October was based on her failure to meet team expectations. UMF 3. Plaintiff Jane Doe 3 offers no evidence or argument demonstrating how this suspension constituted a materially adverse school-related action. Moreover, the record is unclear

as to whether the suspension occurred before or after her first protected activity—

reporting Defendant Glen's conduct to Torossi.  Additionally, there is no support in the

record that Defendant Meghan was aware of Plaintiff Jane Doe 3's report at the time of

the suspension, making any inference of retaliatory intent speculative at best.  Second,

Defendant Meghan's tone and body language do not constitute materially adverse

actions, as "petty slights, minor annoyances, and simple lack of good manners generally

will not rise to the level of materially adverse action."  *Kincaid*, 645 F.Supp.3d at 1162

(internal quotations and citation omitted).  Third, the record does not support Plaintiff

Jane Doe 3's claim that her playing time was reduced sufficiently that it could qualify as

a materially adverse action, let alone show any casual connection between her reports of

Defendant Glen's conduct and her change in playing time.  While the record does not

indisputably establish the date on which Defendant Meghan learned that Jane Doe 3

had reported Defendant Glen for sexual assault, Plaintiff Jane Doe 3's playing time

remained relatively consistent throughout the season.  *See doc. 256-3* at 1-2.  In fact, her

playing time toward the end of the season increased despite Defendant Meghan

becoming aware that Plaintiff Jane Doe 3's allegations were being supported by other

allegations.  *Id.* (reflecting that Plaintiff Jane Doe 3 played average of 27.2 minutes a

game in six games after January 31, 2023, compared to 22.3 minutes a game in the

sixteen games before that date).   Fourth, Defendant Meghan's proposed suspension of

Plaintiff Jane Doe 3 with two games remaining in the season was never implemented,

and thus no action was taken that could be considered materially adverse.  UMF 22.

Plaintiff Jane Doe 3 did not participate in the second-to-last-game by her own choice,

and she both started and played in the final game of the season.  *Id*.

Therefore, because no reasonable factfinder could find that Plaintiffs suffered

materially adverse school-related actions following engaging in protected activity,[4] they

fail to make a prima facie case of direct retaliation under Title IX as a matter of law.

Consequently, their Title IX retaliation claim against Defendant ENMUBOR under this

theory is subject to summary judgment.

## V.   CONCLUSION

In accordance with the foregoing, the Court GRANTS Defendant's Motion (*doc.

181*) IN PART as to Plaintiffs' Title IX claims, DENIES Defendant's Motion IN PART as

to Plaintiffs' state law tort claim based upon a declination of supplemental jurisdiction,

and DENIES Plaintiffs' Motion (*doc. 219*).  Plaintiffs' claims against Defendant Eastern

New Mexico University Board of Regents for violations of Title IX based on theories of

discrimination and retaliation (Count VII) are DISMISSED WITH PREJUDICE.

The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law

tort claim because it finds that the pertinent factors set forth in 28 U.S.C. § 1967(c) weigh

---

[4] Plaintiffs repeatedly refer to their fear that Meghan might retaliate against them by reducing their playing time for reporting Glen or participating in the HR investigation as a retaliation.  However, a retaliation claim requires an actual adverse action—not merely a subjective fear of one.  *See Kincaid*, 645 F.Supp.3d at 1164 (reviewing standard under *Burlington*, 548 U.S. at 67-70).

against the exercise of supplemental jurisdiction.  In an Order entered concurrently

herewith, the Court dismisses Plaintiffs' negligence claim without prejudice and

explains its rationale for declining to exercise supplemental jurisdiction.

      **IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**